and taking all the information or the evidence presented, there was sufficient evidence to show that the parties enter into qualifying marriage in good faith, Your Honor. Would you do me a favor and just sort of, from your perspective, after reading all the evidence in the transcript, point to those factors which you believe demonstrate good faith. There was a joint asset, joint account. Both parties had this bank account. The petitioner deposited all her assets after they got married into this account. And there was photos of the wedding, and her sister, brother-in-law, and some of the friends attended the wedding. And also there was a testimony from the friends who witnessed they were residing at the same place as husband and wife. And one of the friends testified that she met the petitioner and her husband at a grocery market, and she was introduced to the husband as husband when she had no reason to lie. She introduced her husband as husband to this stranger, and she visited her husband's workplace employment. She did not try to hide the fact that they were married, and they were married for, they lived together for over a year after they got married. And there was two other witnesses who testified also to the fact that they visited the residence, and they witnessed that they were living as husband and wife. And also her sister testified that they were sharing the same room, same bedroom. They were living as husband and wife, Your Honor. And I guess we also have the statement from the husband, correct? Yes, there was a statement from the husband that they entered into his marriage out of love, nothing else, and it didn't work out. So there was a testimony from the husband. This is the same husband that a month after the conditional residence was procured, wiped out the bank account and left. Yes, that's the same husband, Your Honor. But they did, they were also together for some period of time in this house, not a matter of days. I'm sorry, Your Honor? For how long, for close to a year or so? About a year, a little over a year, but the divorce took place about three years after the marriage. And also the immigration judge's reason behind in finding, for the grounds for finding that there was no good-faith marriage, she cites that the marriage took place at a park, the marriage was not religious, that she did not use her husband's name. Those factors does not go with the case. That's the heart of the question, whether they had intent to establish a life together at the time of the marriage, Your Honor. Those are immaterial. Anything else? That's all, Your Honor. No questions from the panel, then no more. You can save your time for rebuttal and respond to what the government has to say. Thank you. Good morning, members of the Court. I'm Paul Fiorino for the Attorney General. Judge Paez, you asked a question, what facts in the record establish good faith of a marriage? From your perspective. Yes. You have what factors from your perspective indicate that there wasn't a good-faith marriage. The key point that we'd like to make is that the burden on this case is for the petitioner to show that at the beginning of the marriage, the inception, that this was a bona fide marriage and the parties intended to live together, his husband and wife, established life together. I think, at least for me, the credibility seems to be really critical here in these cases. That is to say, here the I.J. did not make a specific credibility. He did not find her not credible. Well, we disagree with that, Your Honor. Well, could you point to me in the I.J.'s decision where it is that he says, I find this Damon not credible. He refers to inconsistencies in the evidence presented. Where? I thought he just said it was implausible. He chose to say that essentially that he didn't disagree with the fact that they lived together in this house for close to a year. He didn't say they didn't. He just said he just didn't believe that somebody with two kids who had just gotten divorced in Korea would go running off to marry this guy in Hawaii. That's exactly true, and that is not tantamount to him saying that. But they did, in fact, live together for a year in Hawaii, and he doesn't find that not credible. Isn't that pretty good evidence that they intended to do it? They, in fact, did it for a year. Well, what the I.J. was saying was that why would this woman divorce someone in Korea, move to the United States, meet someone, and then seven months later, I think it was, get married to him. All the time. For all we know, she may have gotten divorced, as people often do, long after they separated. It may have been a divorce that was technically necessary in order to marry somebody, but we don't know anything about that divorce, right? It's what the I.J. decided. He found it implausible. He did not, in other words, he did not find that all the evidence that she presented was, he didn't believe everything that she said. He did not believe that she met her burden, and that's the important thing here. But that's a different question. What I'm trying to find out is this. Did he find not credible any of the facts upon which Ms. Kim is relying, i.e., that she came to the United States, lived with this guy for a year, introduced him as her husband, had a joint bank account, and so on? He didn't find any of that not true. Is that right? Correct. All right. So we have to assume all of it is true. We don't have to. Well, those facts, the joint bank account, there's no question about that. They lived together. There's no question about that. Okay. The issue in this case is what was her intent at the time that they got married, and the important thing is that she actually testified in this case, and she never testified why she got married to Scott Damon, and that is the ground upon which the I.J. denied her claim for relief, and that's the issue before this court. Did the I.J. abuse his discretion in making that finding? So from your perspective, what is it then that she would have had to testify to, that she married him because she loved him and she was going to make a permanent relationship with him? Yes. She didn't testify to that. He did. It's very simple. He did. But the burden is not on him. The burden is on her. But there was certainly some evidence that it was true. If you look at all the evidence, it's in the record. It's certainly possible to conclude that perhaps they were in love. In fact, the sister said perhaps they were in love. But what the I.J. was looking at is her burden of proving the bona fides of the marriage at its inception, and he chose in his decision, he said, well, she got up on the stand, she never testified to that. He was looking for that. He never got it. He wasn't cross-examined on it either. She didn't testify to the contrary. She just. Well, I don't know if you can cross-examine on issues that weren't as part of direct. But the burden is on her. She had an attorney. She never testified. All she had to do was say we were in love and I wanted to spend the rest of my life with this man. And that would have made it much more difficult. The other two cases we heard today, the INS is relying on things that happened after the marriage to tell us something about the bona fides of the marriage, right? In other words, the fact that they never lived together, that the guy walked out the first day she arrives. If you take that same approach to this case, isn't that awfully strong evidence on the other side that they did live together for a year? I mean, you're saying it's just to be ignored, that they, in fact, did live together for a year. I think that the case law says that the fact that they ultimately split up cannot in and of itself be. I'm saying the opposite. But they did live together for a year. And that seems, you're saying she didn't meet her burden. But that's pretty strong evidence as to what they intended when they got married to begin with. We would also say that the mere fact that they lived together for that year standing by itself means essentially nothing. But you're trying in the other cases to say that the mere fact that they didn't live together at all means an awful lot. I don't. I think I'm confusing the panel. I apologize. What the I.J. decided in this case was that he looked at all the factors, looked at the case in its entirety, and decided that it didn't seem to him, in this case, that this marriage was bona fide from its inception. And, yes, the fact that they lived together for a year after they got married may be considered, but it's not alone that's positive. And when you look at the facts of their marriage during that year, they never were able to establish any communication. The evidence is that she made no effort to learn English, that they did fight about, I think it was money and his using drugs perhaps and playing drums and so forth and so on. So, you know, standing by itself, the fact that they lived together is not dispositive. I would steer the Court back to the one piece of evidence which is missing in this case. We have... The one you pointed out to me where she didn't testify? Yes. That's key. Let me ask you. You know, when the I.J. gave her reasons for determining that they did not have the intent to establish a life together, she did list a couple of reasons for that, making that ultimate finding. She said, one, there was no evidence of a meaningful courtship. She said the wedding was hastily arranged, was nonreligious, was conducted in a park, and by no one but the respondent's sister and brother-in-law and possibly a friend were present at the wedding. What evidence... There was little evidence showing what they had in common, that is, the couple, why they decided to marry. There was very little evidence of her children, how her children fit into the relationship. And especially that she didn't use Mr. Damon's last name. Now, where does all that come from? I mean, why is that, why does that add up to she didn't have an intent? That's just, when I read that, that's just like, that's the I.J. imposing his own value system. He was drawing... Into determining that they couldn't possibly have had the intent to get married. I think that's what the I.J. is supposed to do. He looks at... Where does this come from? I mean, another I.J. were to hear this and could say something, you know, could come up with another random factor, well, it wasn't, you know, they weren't of the same religion. Well, Congress saw fit to give the Attorney General the discretion to make this call. And there is, there can be no, any formulaic, you know, numerical program to determine this. The I.J. looked at a lot of factors, and you listed them, and I would like to address some of them. With respect to the hastily arranged marriage, with respect to the outdoors, with respect to the non-religious ceremony, we wouldn't put a lot of weight on those factors. However... I'm glad to hear that. Yes. But at the same time, it doesn't shift the burden. No, I understand that. Yeah. You know, people have non-religious weddings all the time. But the real issue is other factors that he looked at, which were very important. The fact that they never factored in her children. You know, the children seemed to enter into the equation. That has a lot to do with whether they intended to build a life together. Did anybody ever ask him that? Did he ask? No. She had an opportunity. It's not unusual for people who have children to get married, and the usual assumption is that they will take care of the children. Now, why does he think that that wasn't the arrangement? Well... And it's also not unusual for people to leave their children abroad until they get settled. Again, she was never asked that. When she testified, she had an opportunity to present her case. But he didn't ask her that, and all of a sudden out of the blue comes this notion that there was something wrong with her arrangements about the children. She wasn't asked anything about her arrangements by him, and he could ask questions. He didn't ask questions. If he was worried about the arrangements with the children, why didn't he ask her? Well, I don't think... Well, he didn't base his decision on that basis alone about the children. But that's the problem. He listed a bunch of things, and you go through each of them. And as we asked him about it, you back off him quite properly, because the religion couldn't matter, the fact that she didn't use his name doesn't sound like a reason, and the fact that he doesn't know what her arrangements were, but he didn't even ask her, doesn't sound like a very good reason. So you go through each of the reasons, and you kind of come up with zero in the end. Well, we would disagree. The issue is did the IJA abuse his discretion in deciding that based on all the factors put together, the fact that she married this person so quickly, the fact that she never testified... He didn't ask that question either. He didn't ask her anything about her divorce in Korea. He just made an assumption about it. When she went into it, she actually had several instances, several opportunities to make this case to the INS. She filed three I-571s. She had a hearing before an immigration judge. The burden is always on her. She knew what she had to show. The best that she could do was an affidavit from her sister that says, I think they were in love. She had an affidavit from Mr. Damon. Yes. That's pretty good. Yes. But the IJA decided it wasn't enough. He wanted to hear from her. He didn't. Is that an abuse of discretion? Did he ask her? Did the IJA say, why did you marry him? I don't think the IJA did. No. Neither did her attorney. So then he made more assumptions. What's that? So then he made some more assumptions against her as to things that weren't there. I mean, in other words, there was a lot of evidence that was there, and then he made inferences from absence of evidence. And he's supposed to do that. He's an immigration judge. He can make inferences from what's not there? I think he can make a decision. If the burden is on her to establish something and she doesn't bring forth that evidence, what else can he conclude but that she hasn't met her burden? But there's a difference between not bringing in evidence and making inferences regarding the absence of evidence, which he did about her divorce. In other words, he made an assumption about her divorce. He made an assumption about the children. It's not that's not I don't see why she has a burden to explain something that is innocent on its face unless he has some problem with it. In other words, how can he, from the fact that she had children, make a negative inference, which is what he did? Well, when the I.J. gave his decision, she could have then addressed that to the Board of Immigration Appeals. She did. She said you shouldn't be making inferences based on that. But, again, our position is that I.J. looks at the evidence before him, the evidence that's there and the lack of evidence, and he makes inferences, and that's what, as a fact finder, he's supposed to do. Thank you. Thank you, Counsel. Ms. Kim, I believe that you had a few minutes left. Contrary to what the other party is arguing, there was sufficient evidence. The petitioner met her burden to show that marriage was entered into in good faith. There was testimony from Mrs. Damon that the marriage was consummated. She had sexual relations with her husband two, three times a week. They were married for a year, lived together at the same residence for over a year. There was testimony from her friends, her sisters. There was this evidence presented that I.J. is supposed to look at evidence presented and make inferences from lack of evidence. Ms. Kim, is the question before this court whether there's sufficient evidence to find in favor of your client or whether there's insufficient evidence to sustain what the immigration judge found? Which is it? The immigration judge did not have sufficient evidence to find it. That's right. So it really doesn't help us for you to argue your case again, as you did quite ably, in the immigration. However, as the panel stated, that the reason stated in support of her finding is just inferences, which was not material to this. Well, here are some of the things that the immigration judge found to sustain her finding. There was objective evidence of a meaningful courtship was lacking, that they could barely communicate and resorted to hand signals, that the courtship was orchestrated by Sung Hee's sister, who wanted her to move to the United States and maybe some other relatives also. The wedding was hastily arranged. Forget the religious in the park portion of it. Attended by no one but Sung Hee's sister and former brother-in-law. None of the Damon folks were there. There was little evidence of joint property, that they shared interests or mutual experience. There was one joint bank account which was wiped out, as we've indicated. It's difficult to discern what they had in common. Sung Hee did not tell her sister why she was going to marry Scott. She didn't testify why she was going to marry Scott in the hearing. There was scant mention of Sung Hee's two children and how they would fit into the couple's life. Sung Hee did not explain why she rushed into marriage with a man she had just met one month after her divorce in Korea. Sung Hee's sister and former husband's relationship with Scott prior to the marriage was not adequately explained, according to the immigration judge. Sung Hee did not know that Scott drank heavily and used drugs. Scott's co-workers did not testify at the hearing, and none of his family or friends went to the wedding. Scott's affidavit states that Sung Hee refused to learn enough English. Now, if the issue is, was there evidence from which she could come to those conclusions, and were those conclusions sufficient? So we have to affirm, that's the issue, isn't it? Yes, Your Honor. Those evidence, as we discussed, is not sufficient to come to a decision. The marriage was not intended as a good-faith marriage because the children, the immigration judge states that there was no discussion about the children. However, if you look at the whole record, the petition was filed by Mr. Damon to have the children come here to live with them. So it is, you can infer, even though there was no specific discussion as to what the children, what kind of role the children will play in the marriage, the children were coming to the United States, and Mr. Damon filed a petition for the children to come here to live with the children. And also, Mrs. Damon testified that she sent money to Korea to support her children, so it was marital property which she sent to Korea. And also, the marriage, which was, there's no courtship. She explained that in Korean tradition, arranged marriage is apparent, and a lot of people just get married without long-term extended courtship, especially for the second or third marriages. So she explained the situation. Thank you. Thank you. Thank you very much. The mattel stands submitted. Thank you for your arguments. The next case on today's calendar is
judges: Paez, Berzon, Bea